IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS E. HUMPHREY, | ) |
| Plaintiff, | ) ) ) 3:23-cv-00109-MRH-MPK |
| v. | ) ) ) |
| PA. DEPT. OF CORRECTIONS, et al., | ) ) |
| Defendants. | ) ) ) ) |

**OPINION**

**Mark R. Hornak, Chief United States District Judge**

Plaintiff Douglas E. Humphrey ("Humphrey") filed this action, asserting fifteen (15) different causes of action (ECF No. 20) and alleging that Defendants Pennsylvania Department of Corrections ("PDC"), PDC Unit Manager Rebecca Witt ("Witt"), and Registered Nurse Supervisor Crevling ("Crevling") deprived him of access to gym, library, and religious services in violation of the United States Constitution and federal law. Humphrey filed a Motion for a Preliminary Injunction and Temporary Restraining Order in an effort to immediately remedy these alleged deprivations. (ECF No. 4). The Motion for Preliminary Injunction has now been fully briefed and is ripe for disposition. For the reasons that follow, the Motion for Preliminary Injunction and Temporary Restraining Order is DENIED.[1]

---

[1] This matter is also referred to Magistrate Judge Maureen P. Kelly. In order to further judicial efficiency, the undersigned will address the request for a preliminary injunction, but all other pretrial matters will proceed with Judge Kelly.

1

I.     Background

Humphrey is an inmate housed on a skilled care medical unit at the PDC's facility at SCI Laurel Highlands. (ECF No. 20). Since his arrival, Humphrey has, at all times, been using a wheelchair. (ECF No. 19-1, ¶ 12). In 2018, Humphrey had a "fem to fem" bypass to remedy poor circulation in his legs. (ECF No. 20, ¶ 1). At that time, Plaintiff was housed in E Block of the facility and had access to the in-unit exercise equipment located on that block. (*Id.*). On April 12, 2022, Humphrey was injured when his wheelchair flipped over. He was diagnosed with a herniated disc in his neck. (*Id.* ¶ 9). After a period of rehabilitation and surgery to correct the herniated disc, Humphrey was moved from E Block to A Block. (*Id.* ¶ 15). Both blocks are medical units, but A Block inmates need more intensive care than E Block inmates. (*Id.*). Though inmates housed on both A Block and E Block have religious, law library, and gym services brought to/provided for them on the Unit, (ECF No. 19-1, ¶ 6–7), Humphrey alleges that the move to A Block reduced his access to these services. It is this alleged reduction in the provision of services that Humphrey seeks to challenge and, for these purposes, seeks a preliminary injunction.

Though all intensive care inmates—on both A Block and E Block—can, only as of late August 2023, access the general religious and library services like the rest of the inmate population, (*id.* ¶ 8) Humphrey and other skilled care inmates still cannot access the main gym to use the exercise equipment located there. (*Id.* ¶ 9). This policy is still in place "because of safety concerns and the availability of [gym] equipment on the housing units." (*Id.*).[2] Dissatisfied with the formerly

---

[2] Defendants note in a supplemental brief that, as of late September 2023, skilled care inmates now have permission to access services in the main gym, but Defendants qualify this alleged increase in access as being limited to meetings and speaker events. (ECF No. 21, ¶ 5). Given that Humphrey's main complaint is that he does not have "full" access to the exercise equipment in the main gym, the expansion of access to the main gym for meetings and speaker events does not address Humphrey's alleged grievances or moot his arguments on this topic.

2

limited religious and law library services and the still limited gym services for intensive care inmates, Humphrey went through the inmate grievance procedures to seek fuller access to these services, but at each level, his grievance was denied. (ECF Nos. 4-4, 4-5, 4-6). Now, Humphrey seeks a preliminary injunction and/or temporary restraining order to provide him with "full" access to these services.[3]

## II. Discussion

A preliminary injunction is an "extraordinary remedy" that is within the discretion of the trial court. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *Washington v. Gilmore,* No. 18-cv-1558, 2019 WL 2610765, at *6 (W.D. Pa. June 26, 2019). It is the movant's burden to show that the "preliminary injunction must be the only way of protecting the [movant] from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992); *Washington*, 2019 WL 2610765, at *6. In assessing whether a movant has met this burden, "[f]our factors are considered: (1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170–71 (3d Cir. 2001). Great weight is placed on these first two prongs, as "preliminary injunctive relief cannot

---

[3] Whether Humphrey ever had "full access" is a point of contention between the parties. Humphrey contends that, after the filing of his original Complaint (ECF No. 2), Defendants, particularly Witt, enforced the "in-Unit services only" policy more rigidly. (*See generally* ECF No. 4; ECF No. 22). Defendants dispute this, stating that Humphrey has been a skilled care inmate for whom the availability of select services has been restricted since he arrived at the facility in 2016. (ECF No. 19-1, ¶¶ 5–6). Defendants further state that Humphrey never had PDC clearance to access the main gym, that they did not know he was attending activities in the main gym, and that when it was discovered that Humphrey was attending activities in the main gym, Humphrey was informed that he was not permitted to go to the main gym. (ECF No. 24-1, ¶ 7). It therefore appears from what is in the record that Humphrey was impermissibly going to the main gym to exercise for an unknown period of time, and when this was discovered, he was informed that he was not medically cleared to do so, per generally applicable prison policy applicable to those on the skilled care Units.

be granted" without a showing of both a likelihood of success on the merits and irreparable injury. *Pettaway v. Overton*, No. CA 13-213, 2014 WL 3747672, at *2 (W.D. Pa. July 29, 2014) (citing *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987)).

Even inmate *pro se* motions for injunctive relief "are judged against exacting legal standards." *Artis v. Byunghak Jin*, No. 13-cv-1226, 2013 WL 5936434, at *2 (W.D. Pa. Nov. 5, 2013). The *Artis* court noted that:

> In the past, inmates have frequently sought preliminary injunctive relief compelling prison officials to take certain actions with respect to them during the pendency of a lawsuit. Yet, such requests, while often made, are rarely embraced by the courts. Instead, applying Rule 65's exacting standards courts have frequently held that prisoner-plaintiffs have not shown that they are entitled to use a motion for preliminary injunction as a vehicle to compel prison officials to provide them with some specific relief and services pending completion of their lawsuits.

*Id.* at *4 (citations omitted). 18 U.S.C. § 3626 further limits the authority of federal courts to provide injunctive relief in the prison context. This statute states that:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity . . . in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). To put it more neatly, "in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

In light of the exacting standards that apply to requests for preliminary injunctions in the prison context, the Court will first examine the likelihood of success on the merits of Humphrey's various arguments before turning to likelihood of irreparable harm to him, the potential harm to

4

the Defendants as the non-moving parties, and the interest of the public relative to a grant of Humphrey's requested injunction.

### a. Success on the Merits: Law Library and Religious Services

At the outset, Humphrey's arguments regarding his access to the law library and religious services are moot. "When the questions or issues presented are no longer 'live,' the case is moot. That is, an issue is moot if changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Ordonez-Tevalan v. Att'y Gen.*, 837 F.3d 331, 339–40 (3d Cir. 2016) (citation omitted). Humphrey obtained access to the external law library and religious services in late September 2023. (ECF No. 19-1, ¶ 8). So even if these claims once had merit, they no longer present a "live" controversy for the purposes of a motion for preliminary injunction and TRO, and the record does not reflect a likelihood of repetition such that the Court should nonetheless proceed further on the merits of these claims at this point. *N.J. Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985) ("[I]f the underlying dispute between the parties is one capable [of] repetition, yet evading review, it remains a justiciable controversy within the meaning of Article III.") (internal citations and quotations omitted). Therefore, arguments regarding access to these services are moot, leaving only Humphrey's argument about his access to external gym services for consideration.

Even if the action were not moot as to this relief, the merits of Humphrey's law library and religious services arguments are thin. As for the law library, prisons only have a duty to provide materials or persons trained in the law such that prisoners are able to "challeng[e] their sentence or the conditions of [their] confinement." *Lewis v. Casey*, 518 U.S. 343, 356 (1996). The Supreme Court has not since addressed the question of what an "adequate" prison law library is. Kelsey Brown, Comment, *How Twenty-First Century Technology Affects Inmates' Access to Prison Law*

5

*Libraries in the United States Prison System*, 21 Marq. Benefits & Soc. Welfare L. Rev. 83, 94 (2020). Given that Humphrey has had access to such services on the Unit and, as the record here demonstrates, has had no issue submitting filings and making legal arguments *pro se* in this very matter, Humphrey is not likely to succeed on the merits of this claim.

As for Humphrey's religious services argument, within the Third Circuit, there appears to be some conflict as to the relevant standard for answering this inquiry. In 1987, the Supreme Court held that an alleged restriction on an inmate's right to free exercise of religion will be upheld "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The *O'Lone* "reasonable relation" test was replaced with a more stringent "compelling interest" standard in the mid-1990s when Congress passed the Religious Freedom Restoration Act ("RFRA"). But in 1997, the Supreme Court held that RFRA was an unconstitutional exercise of Congress's enforcement powers under Section Five of the Fourteenth Amendment of the United States Constitution. *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

Congress, in 2000, then passed the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. The portions of RLUIPA that apply to institutionalized persons "mirror[] RFRA and provide[] that '[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015) (citing 42 U.S.C. § 2000cc-(1)(a)). This provision applies where the substantial burden on Free Exercise is imposed in a program that receives federal financial

assistance or where the burden affects interstate commerce. 42 U.S.C. § 2000cc-1(b). Pennsylvania has accepted federal funds for the PDC, and therefore, this statute applies. *See Koslow v. Pennsylvania,* 302 F.3d 161, 174 (3d Cir. 2002).

But in a 2008 decision—issued more than eight years after RLUIPA was enacted—the Third Circuit relied on *O'Lone* in holding that inmates enjoy their Free Exercise rights "under a more limited framework than the average citizen." *Smith v. Kyler*, 295 F. App'x 479, 481 (3d Cir. 2008) (citing *O'Lone*, 482 U.S. at 348). In *Smith*, the Third Circuit confronted, among other claims, a freestanding Free Exercise Claim akin to the one at issue here. There, the prisoner-appellant alleged that the PDC violated his Free Exercise rights by refusing to provide free Rastafarian religious services. *Id.* at 480. In evaluating the reasonableness of this policy in the Free Exercise context, the Third Circuit stated that courts are to consider four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives that could fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 481 (citing *Turner*, 482 U.S. at 89–91). The *Smith* court did not address RLUIPA in assessing the freestanding Free Exercise claim but did rely on RLUIPA's compelling interest test in assessing the claims made directly under that statute. *Id.* at 481–83. The Court is thus confronted with two standards that have been considered and applied in parallel contexts. But under either of these approaches, Humphrey's arguments fail to demonstrate a likelihood of success on the merits.

Under RLUIPA and the precedential cases in this area, a plaintiff's grievance or request for an accommodation based on the right to Free Exercise "must be sincerely based on a religious belief and not some other motivation." *Holt*, 574 U.S. at 360–61 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014)). In his Motion, Humphrey focuses mainly on the restriction of gym access, only referencing the denial of religious services as a passing, catch-all allegation to indicate the alleged breadth of the PDC's deprivation of services under the governing policy. (*See generally* ECF No. 4).

Humphrey does not state how his religious beliefs or practices have been impacted, and he does not address Defendants' assertion that he has had access to in-Unit religious services at all times. Further, Defendant Witt states that Humphrey has never participated in religious services and that Humphrey has never expressed to her any concerns about the PDC's religious policies for A Block and E Block residents. (ECF No. 19-1, ¶ 11). The lack of focus on religious services in Humphrey's Motion for extraordinary relief and Defendants' assertions that Humphrey does not attend and has not expressed interest in religious services undercut any argument that Humphrey makes under RLUIPA, at least as to his request for injunctive relief. To the extent that Humphrey does hold a sincere religious belief that was being substantially burdened by the PDC's former policy, Defendants' compelling interest in ensuring the health and safety of all inmates, especially skilled care inmates in Humphrey's Unit, and the availability of in-Unit religious services satisfy RLUIPA's two prong test, at least in the context of Humphrey's Motion and his obligation to demonstrate a likelihood of success on the merits.

Humphrey's arguments fare no better under *Smith*. First, Defendants set forth a legitimate government interest in ensuring the health and welfare of skilled care inmates. Because Humphrey uses a wheelchair to navigate the prison facility and has fallen and injured himself in doing so in

8

the past, there is a valid connection between this penological interest and the underlying legitimacy of the policy. Further, nurses and other medical personnel are available in the medical Units, but not in other Units where the sought-after external services were located. Thus, if Humphrey were to injure himself again outside of the Unit, he may not have had ready access to the same level of care as if he had injured himself inside the Unit. Second, there were alternative means of religious worship available in the form of in-Unit religious services.[4] The impact on prison administration/allocation of resources element was not addressed by the parties in their filings but given the deference courts are directed to give prison officials in this context under the Third Circuit's approach, *Smith*, 295 F. App'x at 481, the Court is hesitant to issue an injunction that would drastically alter the way the PDC interacts with all of its skilled care inmates absent supporting proof of likely success advanced by Humphrey in support of such relief. Fourth, there were alternatives that accommodated Humphrey—the in-Unit services. In sum, the in-unit religious services constituted both a reasonable means of providing such services and a reasonable restriction on Humphrey's movement. Humphrey is therefore not likely to succeed on the merits of his religious services claim.

    b.  **Success on the Merits: Gym Services**

Humphrey's claim of an alleged denial of gym services, for the purposes of this Motion, is best treated as an Eighth Amendment violation or an ADA violation. *See Defreitas v. Montgomery Cnty. Corr. Facility*, 525 F. App'x 170, 177 (3d Cir. 2013) (examining the post-conviction denial of access to yard and gym services under the Eighth Amendment and the ADA).[5]

---

[4] The frequency of religious services via the "in-Unit" services is unclear. (ECF No. 19-2. ¶ 9 (stating that Plaintiff had access to religious services "as chaplaincy services visit[ed] the unit")).

[5] "Only [where] the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should [an] injunction issue." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). In assessing whether Humphrey has met this burden, the Court "must exercise [its] discretion in

### i. Eighth Amendment

Under the Eighth Amendment, Humphrey may advance two different theories of liability. First, pursuant to the prohibition against cruel and unusual punishment, a prisoner "must demonstrate that prison conditions deprived him of life's minimum necessities, that the deprivation was sufficiently serious, and that a prison official acted with deliberate indifference in subjecting him to that deprivation." *Id.* at 177 (citing *Renchenski v. Williams*, 622 F.3d 315, 338 (3d Cir. 2010)). In *Defreitas*, the court concluded that the deprivation of the ability to use "the yard, gym, and weight room as used by the general population—fails as a matter of law." *Id.* at 178. Thus, Humphrey's acknowledged access to a more limited set of gym services does not support a cognizable theory under the Cruel and Unusual Punishment Clause of the Eighth Amendment.

Humphrey may also advance a deliberate indifference claim under the Eighth Amendment insofar as he would assert that he needs access to the external gym to remedy his medical conditions:

> "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *See Estelle v. Gamble*, 429 U.S. 97 (1976) (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff must allege facts that demonstrate: (1) he had a serious medical need, and (2) acts or omissions by prison officials that reflect deliberate indifference to that need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

---

weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (internal quotations and citations omitted).

*Trainor v. Wellpath*, No. 20-CV-00225, 2023 WL 2603196, at *16 (W.D. Pa. Mar. 22, 2023) (analyzing a prisoner's complaint that he could not attend prescribed gym sessions to treat spinal and leg injuries). The *Trainor* court ultimately rejected plaintiff's deliberate indifference claim, concluding that "Trainor's disagreements with his medical providers, available gym equipment, and prison policies setting times for the med-line and accessing the gym and prohibiting inmates in the RHU from receiving a stationary bike in an RHU cell do not support a finding of deliberate indifference." *Id.* at *19.

Unlike the situation in *Trainor*, the record advanced by Humphrey does not demonstrate that he has been prescribed a treatment plan as a matter of medical care via gym usage. (ECF No. 19-1, ¶ 10 (stating that Humphrey does not have a medical recommendation for use of particular exercise equipment)). Additionally, part of Humphrey's argument is that *he is* healthy enough to access the external gym. Contending that his denial of external gym services is harming his ability to exercise his legs, for medical reasons, is thus paradoxical. And if Humphrey were to focus on medical treatment rather than gym access under this theory, the record does not reveal that he was ever restricted from going to the main gym for *medical treatment* sessions. (*Id.* ¶ 11). As a result, Humphrey is not likely to succeed on the merits as to his gym access claim under a deliberate indifference theory.

### ii. ADA

Humphrey also appears to contend that his deprivation of access to the services in the main gym[6] violates Title II of the ADA. Under the ADA, a plaintiff must establish that "(1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the

---

[6] As in use of the "main" gym external to the equipment available on the medical Units.

benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Defreitas*, 515 F. App'x at 178 (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n. 32 (3d Cir. 2007)).

Insofar as Humphrey argues that he was denied access to the external gym because of his disability, this argument fails. While Humphrey does have a disability because of his leg injuries that require the use of a wheelchair, he was not "denied" a service because he had substitute gym access in the form of in-Unit exercise equipment. (ECF No. 19-1, ¶ 6).

But even assuming that Humphrey was denied a service or benefit, Humphrey fails to show that this denial was "because" of his disability. In *Defreitas*, the Third Circuit rejected a similar argument centered on the denial of gym services, concluding that the appellant's amputee status alone did not constitute discrimination.[7] *Defreitas*, 515 F. App'x at 179. In reaching this conclusion, the *DeFreitas* court noted that this denial was entitled to deference because it was connected to prison policies related to safety and security, which "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment." *Id.* (quoting *Turner*, 482 U.S. at 86). Similarly, here, Humphrey has been denied access to the main gym because prison officials are concerned for his safety given his underlying medical conditions, the medical Units in which Humphrey can use exercise equipment are staffed by medical professionals, and if injury were to occur, Humphrey is better positioned to receive immediate treatment and care in these

---

[7] Unlike in the instant matter, Defreitas did not receive access to any gym services whatsoever. And here, the record before the Court also shows that the inability to use the "main gym" for those on Humphrey's Unit is applicable to all inmates on that Unit, not just Humphrey, which undercuts his contention that he was personally denied a service due to a handicap personal to him.

Units. "Thus, although [Plaintiff] may not have gotten the [type of access to services] he wished," what he received instead was reasonable. *Id.* Humphrey is therefore not likely to succeed on the merits of an ADA claim as to his gym access claim.

### c. Likelihood of Irreparable Harm

The other "weighty" element considered when analyzing a request for a preliminary injunction is the likelihood of irreparable harm to the moving party if the request is denied. The plaintiff bears the burden of making this showing. *Pettaway*, 2014 WL 3747672, at *3 (citing *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989)). Humphrey "must demonstrate immediate irreparable injury, which is more than merely serious or substantial harm." *Id.* (citing *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)).

Here, there is no showing of immediate irreparable harm. Humphrey's main complaint, lack of access to the main gym, is not substantially serious for these purposes. Defendants state that Humphrey was never restricted from receiving medical care or treatment for his various injuries, and Humphrey did not have a doctor's order or other medical direction stating that he *needed* to use the specific equipment in the main gym to exercise his legs. (ECF No. 19-1, ¶¶ 10–11). At best, Humphrey's complaints as to the inadequacy of the Unit gym equipment is an issue of his preference. Humphrey still has access to gym equipment, just not the equipment he would prefer. This alleged inadequacy falls far short of a showing of immediate *irreparable* harm.

As for the alleged restriction of his access to library and religious services, mootness undercuts Humphrey's arguments as to this factor. Humphrey (and others on his Unit) have been provided access to the external law library and religious services. (*Id.* ¶ 8). But even if such weren't the case, the availability of in-Unit services reduces the impact of any potential harm. Thus,

Humphrey is not likely to suffer an immediate irreparable harm because he has access to gym services, albeit more limited, and to full religious and library services.

### d. Remaining Preliminary Injunction Elements

The remaining considerations carry less weight but are nonetheless important. These factors concern the burden of the issuance of any injunction on the non-moving party and the balancing of the public interest in the grant or denial of the relief sought.

Defendants would likely be burdened in that the infrastructure and policies of the PDC would need to undergo a substantial rework to ensure all similarly situated skilled care inmates are treated in the same manner as Humphrey would be if the relief he seeks were granted. Given the repeated caution from our Court of Appeals regarding deference to prison administration and policies in these circumstances, especially when those policies concern inmate health and safety, the Court concludes that granting Humphrey's proposed preliminary injunction would substantially burden Defendants, and even on the record Humphrey advances, that burden would substantially outweigh the benefit of the relief sought.

As for the public interest, while there is such an interest in ensuring that prisoners are treated fairly by prison officials and the policies that they enforce, ensuring necessary access to the types of services individual inmates require, when considering that there were adequate replacement services offered for each alleged deprivation of which Humphrey complains, it is difficult to conclude that the public interest would be better served by the issuance of a preliminary injunction in the circumstances present here.

### III.  Conclusion

Humphrey has failed to show that he is likely to succeed on the merits and that he is likely to suffer immediate irreparable injury with respect to his claims regarding inadequate access to religious, law library, and gym services at SCI Laurel Highlands, as would support the grant of the extraordinary relief he seeks.

The Court DENIES Humphrey's Motion for Preliminary Injunction and Temporary Restraining Order (ECF No. 4) without prejudice. This action will now proceed as to merits-related matters before Magistrate Judge Kelly.

An appropriate Order will issue.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated:  October 24, 2023
cc: All counsel of record.